```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| ROBERT TROY WARRINER, JR., R. TROY WARRINER, SR., and TERESA WARRINER, | |
| Plaintiffs, | HONORABLE JEROME B. SIMANDLE |
| v. | Civil Action No. 03-2211 (JBS) |
| ROBERT P. STANTON, M.D., ALFRED I. DUPONT HOSPITAL FOR CHILDREN OF THE DE NEMOURS FOUNDATION a/k/a ALFRED I. DUPONT HOSPITAL FOR CHILDREN, ALFRED I. DUPONT INSTITUTE OF THE NEMOURS FOUNDATION, and THE NEMOURS FOUNDATION, INC., | **OPINION** |
| Defendants. | |

APPEARANCES:

Michael Rakoski, Esq.
RAKOSKI AND ROSS
76 East Main Street
Marlton, NJ 08053
    Attorney for Plaintiffs

Eugene D. McGurk, Jr., Esq.
RAYNES, MCCARTY, BINDER, ROSS & MUNDY, ESQS.
116 White Horse Pike
Haddon Heights, NJ 08035
    Attorney for Defendants

**SIMANDLE**, District Judge:

    This case arises out of Plaintiffs' allegations that the DuPont Defendants, through its doctor, Robert P. Stanton, M.D., provided deficient medical care on December 5, 1996 when Dr. Stanton performed orthopedic surgery to correct seven-year-old

Plaintiff Robert Warriner's condition of "talipes equinovarus" or "club feet" at its Wilmington, Delaware hospital.  The principal issue to be determined pertains to choice of law, namely whether the statute of limitations law of New Jersey or that of Delaware is applicable here.

This matter comes before the Court upon the motion of Defendant The Nemours Foundation, Inc. for summary judgment.  For the reasons stated herein, Defendant's motion will be granted.

## BACKGROUND

The following facts are derived from the stipulation of undisputed facts entered into by the parties.  Robert T. Warriner, Jr. was born with clubbed feet.  Within twelve days of his birth on June 8, 1989, the infant's New Jersey pediatrician, Barry Kessler, M.D., referred the Warriners to the A.I. duPont Hospital for Children ("AIDHC") in Wilmington, Delaware for pediatric orthopedic care.  (Defs.' Ex. D at ¶4.)  Dr. Robert Stanton of AIDHC diagnosed Robert with talipes equinovarus ("club foot") and between 1989 and 1996, Dr. Stanton performed several surgeries to correct this condition in Wilmington, Delaware.  (Id. at ¶2.)  In December of 1996, Dr. Stanton performed a surgery in Wilmington, Delaware, which is the subject of this litigation.  Plaintiffs allege that the December 1996 surgery was "inappropriately designed" by Dr. Stanton and "resulted in an

overcorrection which detrimentally effected [sic] Robert's ability to ambulate."  (Id. at ¶3.)

When Dr. Stanton began to treat Robert in 1989, The Nemours Foundation did not operate a medical facility, nor did its physicians provide medical care, in the State of New Jersey. (Id. at ¶5.)  Dr. Stanton has been employed by The Nemours Foundation, Inc. ("Nemours Foundation" or "Nemours") since 1988. (Id. at ¶7.)  Since 1995, however, Dr. Stanton has maintained an active New Jersey medical license, upon the instruction of his employer, The Nemours Foundation, which requested that Dr. Stanton obtain his New Jersey license to practice medicine to facilitate the collection of medical payments from the State of New Jersey for treatment rendered by Dr. Stanton to New Jersey patients.  (Id. at ¶8.)  Dr. Stanton continues to maintain an active New Jersey medical license, the renewal fees for which are paid for by The Nemours Foundation.  (Id. at ¶9.)

In 1997, The Nemours Foundation developed the AtlanticCare/duPont Children's Health Program, a pediatric partnership between AtlantiCare and AIDHC, offering southern New Jersey residents, for the first time, access in New Jersey to pediatric specialists employed by Nemours.  (Id. at ¶12.)  From approximately September 1998 through May 2001, Dr. Stanton was one of the pediatric specialists affiliated with the Atlantic

3

Care/duPont Children's Health Program in New Jersey.  (Id. at ¶13.)

This case was removed from state court on May 13, 2003 and Defendants filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on September 26, 2003.  After the filing of this motion, the parties stipulated to the dismissal of Defendant Robert B. Stanton, M.D.  On June 30, 2004, this Court denied Defendants' motion to dismiss without prejudice to their reassertion of the statute of limitations defense in a motion for summary judgment devoted to that issue.  The instant motion for summary judgment on the limitations issue was filed on September 20, 2004.

## DISCUSSION

Summary Judgment Standard

The legal principles governing this motion are well-established.  Summary judgment is appropriate only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  Id.

In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "[T]he nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Liberty Lobby, 477 U.S. at 255). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250; Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (internal citation omitted).[1]  Moreover, Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made
> and supported as provided in this rule, an

---

[1] The moving party always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party ultimately would have the burden of persuasion at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Country Floors v. Partnership of Gepner and Ford, 930 F.2d 1056, 1061-63 (3d Cir. 1991)(reviewing district court's grant of summary judgment in a trademark action); Lucent Info. Manage. v. Lucent Tech., 986 F. Supp. 253, 257 (D.N.J. 1997)(granting summary judgment in favor of telecommunications provider in trademark action), aff'd, 186 F.3d 311 (3d Cir. 1999); Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989), cert. denied, 493 U.S. 1023 (1990). However, where the nonmoving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325.

> adverse party may not rest upon the mere
> allegations or denials of the adverse party's
> pleading, but the adverse party's response,
> by affidavits or as otherwise provided in
> this rule, must set forth specific facts
> showing that there is a genuine issue for
> trial.  If the adverse party does not so
> respond, summary judgment, if appropriate,
> shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).  Thus, if the plaintiff's evidence is a mere scintilla or is "not significantly probative," the court may grant summary judgment.  <u>Liberty Lobby</u>, 477 U.S. at 249-50; <u>Country Floors</u>, 930 F.2d at 1061-62.

<u>Choice of Law</u>

The present motion requires the Court to determine whether this case, involving surgery performed on a New Jersey resident which occurred in Delaware, is governed by Delaware's two-year statute of limitations or by New Jersey's statute of limitations which is tolled until the minor plaintiff reaches the age of eighteen.  As a federal court sitting in diversity, this Court is obligated to apply the choice of law rules of the forum state – in this case, New Jersey.  <u>See</u> <u>Klaxon Co. v. Stentor Elec. Mfg.</u>, 313 U.S. 487 (1941).  New Jersey's choice of law principles dictate that a court use a flexible "governmental-interest" analysis "which requires application of the law of the state with the greatest interest in resolving the particular issue."  <u>Gantes v. Kason Corp.</u>, 679 A.2d 106, 109 (N.J. 1996); <u>Veazey v. Doremus</u>, 510 A.2d 1187 (N.J. 1986).  Until 1973, the New Jersey

governmental interest approach applied only to choices of substantive law.  Procedural matters, such as the appropriate statute of limitations, were governed by forum law.  In <u>Heavner v. Uniroyal, Inc.</u>, 305 A.2d 412 (N.J. 1973), however, the New Jersey Supreme Court abandoned the mechanistic application of the forum statute of limitations in cases where a foreign substantive law was chosen, in an attempt to discourage forum shopping.  In determining whether the present cause of action is time-barred, New Jersey choice of law rules therefore require a determination of which law will govern the merits of the case.  Moreover, the Third Circuit has cautioned that "[t]o consider the limitation period in isolation . . . defeats the very purpose of <u>Heavner</u> which seeks to discourage forum shopping."  <u>Henry v. Richardson-Merrell, Inc.</u>, 508 F.2d 28, 32 n.10 (3d Cir. 1975).  "[T]he critical determination underlying the 'borrowing' of a foreign statute of limitations is a determination as to whether a foreign substantive law is to be applied."  <u>Schum v. Bailey</u>, 578 F.2d 493, 495 (3d Cir. 1978).

    The first prong of the New Jersey governmental-interest analysis requires a court to assess whether there is an actual conflict between the relevant laws of the respective states.  If the court determines that such an actual conflict does exist, the second prong of the analysis "seeks to determine the interest that each state has in resolving the specific issue in dispute,"

7

by determining the factual contacts between the parties and each related jurisdiction.  <u>Gantes</u>, 679 A.2d at 109.  The "qualitative, not the quantitative" nature of each state's interest must ultimately determine which state's laws should apply.  <u>Veazey</u>, 510 A.2d at 1189-1190.  "[T]he object of the governmental interest analysis is to determine, based on the policies underlying the respective law of each state and the significance of its respective contacts with the litigation, which state, in the circumstances, has the paramount interest in the enforcement of its law respecting the specific issue in question."  <u>Butkera v. Hudson River Sloop "Clearwater," Inc.</u>, 693 A.2d 520, 522 (N.J. 1997).

As the present motion involves the election of a statute of limitations from two possible options, namely Delaware's two-year statute of limitations and New Jersey's statute of limitations which is tolled until the minor plaintiff reaches the age of eighteen, a direct conflict between the laws of the two states exists.  Plaintiffs' January 17, 2003 Complaint regarding the December 5, 1996 surgery is time-barred if Delaware law applies, and is not time-barred if New Jersey law applies.

Having identified an actual conflict between the relevant laws of the two states, this Court must next examine the nature and magnitude of each state's interest in seeing its laws applied in this case.  Critical to the determination is the "nature of

8

the contacts that the state has to the litigation and to the parties." See Gantes v. Kason Corp., 679 A.2d 106, 110 (N.J. 1996). Other factors are also relevant, such as the interests of interstate comity; the interests of the parties; the interests underlying the field of law; the interests of judicial administration; and the competing interests of the states. See Restatement, §§ 6, 145 comment b; see also Pfizer, Inc. v. Employers Ins. of Wausau, 712 A.2d 634, 639 (N.J. 1998). Particularly relevant to this inquiry is where the injury occurred, where the conduct at issue occurred, where the parties reside, and where the relationship between the parties is centered. Fu v. Fu, 733 A.2d 1133, 1142 (N.J. 1999).

Plaintiffs' instant lawsuit sounds in tort law, presenting an issue of alleged medical malpractice. The Third Circuit has consistently "identified New Jersey's policies in a tort context as consisting primarily of compensation and deterrence." Schum, 578 F.2d at 496. Thus, New Jersey's strong interest in protecting compensation rights of its domiciliaries is implicated here. At the same time, Delaware, which has a strong interest in protecting the rights of its domiciliary defendants in guest-host situations, see Shuder v. McDonald's Corp., 859 F.2d 266, 270 (3d Cir. 1988), also has the same interest in the compensation of its own domiciliaries, while simultaneously having no interest in compensating a non-domiciliary.

In addition, while New Jersey expresses an equally strong interest in deterring future misconduct, as presumably would Delaware, Delaware has also expressed an additional interest in protecting its health care providers.  Indeed, Delaware's statutory scheme reflects its legislature's intent to provide a remedy to injured parties while simultaneously shielding Delaware's health care providers from the rising costs of malpractice liability insurance, which it determined was driven, at least in part, by the costs of defending malpractice suits. See 18 Del. Code Ann. § 6856; DiFilippo v. Beck, 520 F. Supp. 1009, 1011 (D. Del. 1981) ("The adoption of the Act in 1976 was the response of the Delaware General Assembly to what it perceived to be a malpractice crisis in medical care."); Dunn v. St. Francis Hospital, Inc., 401 A.2d 77, 79 (Del. 1979).

Having examined the governmental policies evidenced by the laws of New Jersey and Delaware, the Court turns next to the factual contacts between the parties and the related jurisdictions. See Henry, 508 F.2d at 32.  In 1989, in the early days after birth, Robert Warriner received medical treatment in New Jersey from Dr. Barry Kessler, a pediatrician not employed by or affiliated with The Nemours Foundation, at the Atlantic City Medical Center, a facility not owned or operated by, or otherwise affiliated with The Nemours Foundation.  (Defs.' Ex. D at ¶4.) Dr. Kessler referred Robert to AIDHC in Wilmington, Delaware, for

pediatric orthopedic care.  (Id.)  Upon this referral, Robert's parents took him to Delaware, for medical treatment with Dr. Stanton.  (Id. at ¶2.)  He received no medical care from Dr. Stanton or any other Nemours physician in New Jersey before coming to Delaware in 1989 or at any time thereafter.  (Id. at ¶6.)

Moreover, The Nemours Foundation did not operate a medical facility in New Jersey, and its physicians, including Dr. Stanton, did not provide medical care in New Jersey in 1989. (Id. at ¶5; Defs.' Ex. F, Deposition of Robert P. Stanton, M.D. at 9-10.)  Prior to developing the AtlanticCare/duPont Children's Health Program in 1997, Nemours operated no medical facility in New Jersey and offered New Jersey residents no access in New Jersey to pediatric specialists employed by The Nemours Foundation.  (Defs.' Ex. D at ¶12.)

While Dr. Stanton has maintained a New Jersey medical license from 1995 until the present, he was not licensed to practice medicine in New Jersey at the time Plaintiffs traveled to see him in Delaware.  (Id. at ¶8.)  Moreover, Dr. Stanton did not see a single patient in New Jersey until September 1998, nearly two years after the alleged negligent conduct in this case.  (Defs.' Ex. F, Stanton Depo. at 15-17; Defs.' Ex. D at ¶17.)  While The Nemours Foundation did establish a formal presence for its physicians to treat patients in New Jersey in

11

1997, Robert Warriner has never received medical treatment from a Nemours physician or at a Nemours facility in New Jersey. (Defs.' Ex. D at ¶6.)

Plaintiffs elected to travel to Delaware in 1989 for specialized medical treatment that was then unavailable to them in New Jersey. For nearly eight years thereafter, even after the establishment of a Nemours-related facility in New Jersey in 1997, Plaintiffs continued to receive medical treatment solely in Delaware, including the allegedly negligent surgery at issue in this lawsuit in 1996.

Although New Jersey's sole interest in this case arises out of Plaintiffs' residence, that interest is greatly attenuated in this case because New Jersey has no connection to the acts giving rise to this lawsuit. Moreover, in light of Delaware's comprehensive contacts with the events giving rise to this litigation, Delaware's strong governmental interest in applying its laws to torts that are alleged to have occurred within its borders, committed by physicians practicing within those borders, must be said to predominate.

In arguing that New Jersey's law with respect to statute of limitations is applicable here, Plaintiffs place principal reliance upon the Third Circuit's holding in Schum v. Bailey, 578 F.2d 493 (3d Cir. 1978). In Schum, the plaintiff was a New Jersey resident who filed a medical malpractice lawsuit against

12

her New York physician arising out of surgery and treatment performed in New York.  The plaintiff, who initially consulted a New Jersey physician, was referred by that doctor to the defendant in New York.  All of the defendant's services, including the surgery at issue, were performed in New York, the state in which the defendant maintained his major practice.  The Third Circuit held that the New Jersey statute of limitations applied due to "New Jersey's strong interest in protecting the compensation rights of its domiciliaries" as well as New Jersey's interest in deterring tortious conduct on the part of medical practitioners.  Schum, 578 F.2d at 496-97.

Schum, however, is distinguishable from the present case.  First, the Third Circuit in Schum found that "the application of New Jersey law in no way conflicts with any New York interest."  Id. at 496.  The court found that New York's interests in compensation of its own domiciliaries and deterrence of future misconduct were the same as New Jersey's, and therefore those interests would be adequately served by application of New Jersey law.  The court then went on to conclude that "since [the] record reveals no conflict between New York and New Jersey insofar as the application of their substantive laws is concerned, and since the record also reveals that New Jersey has a substantial interest in the application of its own law, we conclude that New

13

Jersey, as an interested forum, would apply its own law of liability."  Schum, 578 F.2d at 497.

This case, however, unlike the facts of Schum, presents a true conflict between the interests of New Jersey and Delaware. While New Jersey's law evinces an interest in compensation and deterrence as well as a desire to protect minors who are not well-versed in legal matters from the adverse consequences of their inexperience, Delaware's statutory scheme reflects its legislature's interest in not only providing compensation to Delaware domiciled injured parties and deterring future malpractice but also in shielding Delaware health care providers from the rising costs of malpractice liability insurance.

Moreover, the court's analysis in Schum is distinguishable on certain facts.  In Schum, the defendant doctor, while a resident of New York and having conducted the surgery at issue in New York, was also "a staff member of, and performed professional services at, at least two New Jersey medical facilities" at the time of the incident giving rise to the litigation.  Id. at 494.  The Third Circuit found it important that the defendant "was an active member of the staff of St. Michael's Medical Center in Newark from 1950-1953, served there variously as a consultant in Cardio-Surgery and an attending surgeon from 1954-1973, and was placed on 'active' staff both at St. Michael's and at the Jersey City Medical Center in 1973."  Id. at 497.  In reversing the

14

district court, the Third Circuit found that the district court had completely ignored the associations which the defendant had with New Jersey hospitals.  Id. at 497 n.4.

Here, at the time of the alleged malpractice, Defendants had no contact with New Jersey.  While it is true that Dr. Stanton has held a license to practice medicine in New Jersey since 1995, there is no evidence that he practiced in New Jersey at the time of the alleged malpractice.  Moreover, the parties have stipulated to the fact that Dr. Stanton provided no care for Robert in New Jersey at any time.  Similarly, while Dr. Stanton joined the staff of two New Jersey medical facilities in September 1998, he never administered care to Robert at either facility and, in fact, had altogether stopped providing medical care to Robert in Delaware by that time.  Robert's place of residence yields this case's only connection to New Jersey.  In light of this fact, the extensive connections of Delaware to all parties in this case, and the paramount interest of Delaware in regulating the medical care offered within its borders by shielding in-state physicians and hospitals from high insurance premiums and stale malpractice claims, this Court must apply Delaware's statute of limitations to the instant action.  In so doing, Plaintiffs' suit is time-barred and must be dismissed.

15

**CONCLUSION**

For the reasons discussed above, this Court will apply the statute of limitations of Delaware to the instant lawsuit. Thus, Defendant The Nemours Foundation's motion for summary judgment will be granted and Plaintiff's case will be dismissed as time-barred.


**June 14, 2005**              **s/ Jerome B. Simandle**
DATE                           JEROME B. SIMANDLE
                               United States District Judge